CONSOLIDATED ENGINE STOP CO. v. LANDERS, FRARY & CLARK.

(Circuit Court of Appeals, Second Circuit. February 11, 1908.)

No. 94.

1. PATENTS—INFRINGEMENT—THROTTLE VALVE.
    The Stannard patent, No. 509,334, for an improvement in throttle valves, consisting of an electrically controlled emergency valve to shut off the steam passing to an engine, has as an element of each claim a steam pas-

sageway to permit steam to pass into the chamber at one end of a balanced puppet valve, and is not infringed by the device of the Locke patent, No. 812,279, which has no such steamway nor its equivalent.

2. SAME—CONSTRUCTION OF CLAIMS.

A patentee who has made a particular feature an element of his claims, although it may not have been essential to his invention, cannot claim that it is immaterial or that a device which dispenses with it is an infringement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 376.]

Appeal from the Circuit Court of the United States for the District of Connecticut.

For opinion below, see 151 Fed. 775.

Emerson R. Newell, for appellant.
E. S. Beach, for appellees.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge. This is a suit alleging the infringement of patent No. 509,334, granted November 21, 1893, to John E. Stannard, for improvements in throttle valves. The defenses are noninfringement and the invalidity of the patent. The former defense will be first considered. If there be no infringement, consideration of the other questions is unnecessary.

The patented device is a throttle valve to shut off the steam passing to an engine, and may be operated by means of an electrical connection from any point in a factory. It is an emergency valve, and is designed to be used whenever, in case of accident or for other reasons, it is desired to stop the engine without the delay of communicating with the engineer. The following drawing taken from the complainant's brief illustrates the construction of the throttle valve:

Top.

The shell or valve body (a) is cross-shaped, having two cylindrical passages intersecting at right angles. The vertical passage is the steamway, and is practically a part of the steam pipe from the boiler to the engine. Fitted to slide in the horizontal passage is the valve or shut-off plug (b), of sufficient size, when in position, to close the steamway. Connected with the shut-off plug by a comparatively small rod, slightly longer than the diameter of the steamway, is the piston or disk (c). On the piston is the cone-shaped valve (n). At the left end of the shut-off plug (b) is the handled rod (e), which passes through the cap (r) on the left end of the horizontal passage. At the right end

of this passage is the cap (y), provided with an outlet to the atmosphere controlled by the plug cock (f). This plug cock is turned by the lever (g), to which is attached the weighted lever (h). The movement of this weighted lever is controlled by an electrical connection. The passageway (p) shown in this drawing is described in the specification and claim, but is not shown in the drawings of the patent. It extends from the steamway to the opening between the cap (r) and the plug (b).

The operation of the device is as follows: When the throttle valve is open and steam is passing freely from the boiler to the engine the parts will be in the position shown in the illustration. The plug cock (f) will be closed. The shut-off plug (b) will be at the left side of the steamway and will not interfere with the passage of steam. The steam will pass through the passageway (p) and fill the space between the plug (b) and the left end of the chamber. The steam in this opening would naturally tend to move the plug to the right and thus close the steamway. So, although the patent is silent about a passageway from the steamway to the opening at the right of the piston (c), it is evident that it is intended either that one should be provided or that the piston should be sufficiently loose to allow the steam to leak through. The pressure of the steam thus filling the opening at the right of the piston (c) would act in opposition to the pressure at the left of the plug (b), which would not move. This balancing of steam pressure is the reason why valves of this character are called "balanced valves."

Now, when an emergency arises and a person at a distant point desires to stop the engine, he makes an electrical connection which actuates the weighted lever (h). This in turn moves the lever (g) and opens the plug cock (f), allowing the steam in the opening at the right of the piston (c) to escape into the atmosphere. The pressure no longer balances. There is nothing to oppose the pressure of the steam at the left of the plug (b), which moves from the position shown in the drawing to the right until it closes the steamway and causes the engine to stop. When it is desired to start the engine again, the plug cock (f) is closed, the shut-off plug (b) is pushed to the left by the handle (e), steam enters on both sides, and the plug is balanced as before.

Having considered the construction and operation of the device, it is desirable to note the following claims of the patent which it is claimed the defendant infringes:

"1. The combination of a suitable shell or valve body, provided with an opening for the passage of steam, a shutoff plug (b), having a portion (c) arranged therein, a passageway (p) in the shell to allow the steam to enter the opening between the screw cap (r) and the plug (b), means arranged to open and close the outlet from the chamber formed between the portion (c) and the screw cap (y), whereby the steam upon the opening of said outlet is allowed to operate to carry the body of the plug across the steamway and close the valve, substantially as and for the purposes stated.

"2. The combination of the shell (a), a plug (b) having a disk (c) arranged therein and having an opening for the passage of steam between the parts (b) and (c), a plug cock (f) mounted in one end of the valve body, a steamway (p) formed in the wall of the valve body at the opposite end portion, a lever (g) mounted upon the plug, a lever (h) pivotally mounted adjacent thereto, a weight arranged upon the lever (h), a latch arranged to hold the lever (h) in its raised position, and means to move said latch and release the lever and allow it to fall by gravity and engage the lever (g), thereby turning the plug, substantially as and for the purposes stated."

160 F.—6

It will be observed that an essential feature of the invention as stated in the claims and specifications is the passageway (p). It is particularly included in both claims. In the first claim it is described as "a passageway (p) in the shell to allow the steam to enter the opening." In the second claim it is spoken of as "a steamway (p) formed in the wall of the valve body." In the specification it is described as "the opening or channel (p) in the shell." The passageway (p) is thus evidently intended to be a separate and distinct passage in the shell or wall of the valve body, as illustrated in the foregoing drawing taken from the complainant's brief. Certainly a passageway channeled in the shell, if not actually bored through it, is required by the claims. And, the patentee, having made the passageway (p) a separate element of his claims, no other throttle valve infringes, unless it too possesses such a passageway or its equivalent.

The defendant's device is called an "automatic engine stop" and is manufactured under patent No. 812,279, issued February 13, 1906, to Nathaniel C. Locke. The following drawing from the patent, showing the main valve, illustrates the device so far as is necessary for the purposes of this case:

Top.

I indicates the steam inlet from the boiler, and O the outlet to the engine. 62 and 63 show a double puppet valve which controls the passage of the steam through the steamway. This carries the piston (60) which is loose in the cylindrical portion (64) of the casing. 65 is a chamber at the right end of the piston. 40 is a pipe leading to what is called the "fluid pressure motor" and the "relief valve," not shown in the drawing. It is unnecessary to describe the fluid pressure motor and the relief valve, further than to say that they are devices by which, when operated through an electrical connection, the steam is allowed to flow out into the atmosphere and the pressure in the pipe (40) and the chamber (65) is reduced.

The operation of the device is as follows: When the main valve is open the steam enters through the inlet (I), floods the whole chamber, and passes through the open puppet valves to the engine. In filling the chamber it necessarily fills the space (66) at the left of the puppet valve, and also flows past the loose piston (60) into the chamber (65), and thence through the pipe (40) into the fluid pressure motor. The chamber being filled with steam, the pressure in all directions is the same, the puppet valves and piston are balanced, and the steam flows freely to the engine. When the relief valve is opened the steam in the fluid pressure motor escapes, the pressure in its chamber, in the pipe, and in the chamber (65) is diminished, the piston is unbalanced, and the pressure of the steam on the left end of the puppet valves forces them to the right, seats them, and shuts off the steam from the engine.

It thus appears that the defendant's device is a balanced emergency valve of the same general character as the complainant's. In determining whether it infringes, we will apply the test already led up to: Does it possess the passageway (p) of the patent in suit or its equivalent? Now a comparison of the two devices shows nothing corresponding to this separate passageway in the defendant's construction. The puppet valves are so located in the main steamway that they are balanced by the steam flooding it. They are closed when pressure is removed from one end by the direct pressure of the steam in the main steamway. There is no separate passageway to the left end of the puppet valve, and no necessity for any. The body or shell of the defendant's device is so constructed that the steam in the main steamway furnishes all the pressures required for the different operations of the valves and pistons. The Stannard four-branch construction, on the other hand, involves a separate chamber at the left of the shut-off plug and, consequently, a separate passageway to it.

But the complainant contends that the principle that a single device may be the equivalent of two or more elements of a claim should apply in this case; that the defendant's main steamway fulfills the functions of both the main steamway and the separate passageway of the patent in suit. This contention is not well founded. While the defendant's steamway does fulfill the function of the complainant's steamway, it does not convey a separate supply of steam to the end of the puppet valve, and consequently it does not fulfill the function of the passageway (p). It is true that in the defendant's device this addition-

al supply of steam is not required; but that does not change the nature of what the defendant's steamway actually does. The operation of the defendant's device and its general nature is very similar to that of the complainant's. It employs the double puppet construction, instead of a single shut-off plug and the relief valve, and its connections are much more complicated. Had the claims of the Stannard patent contained less elements, it might have been difficult to avoid the charge of infringement. Especially, had the patentee been willing to let them stand without the requirement of the passageway (p), there would have been ground for claiming that the whole chamber of his throttle valve was the main steamway—the steam leaking to the left behind the shut-off plug and to the right in front of the piston—and thus corresponding to the defendant's steamway. It will be remembered that he did not provide for a passageway to the right, although it was as necessary that steam should enter there as to the left. But, while the requirement of an additional passageway may have been unnecessary, the patentee chose to make it an element of his claims. The defendant's device does not possess it, or its equivalent. Consequently, while the defendant's construction may accomplish the same purpose as that of the complainant's, it does not infringe.

The language of the Supreme Court of the United States in Wright v. Yuengling, 155 U. S. 52, 15 Sup. Ct. 3, 39 L. Ed. 64, well applies to this case:

"Now, while this semicircular connecting piece may be an immaterial feature of the Wright invention, and the purpose for which it is employed accomplished, though less perfectly, by the extension of the guiding cylinder in the manner indicated in defendant's device, yet the patentee, having described it in the specification and declared it to be an essential feature of his invention, and having made it an element of these two claims, is not now at liberty to say that it is immaterial, or that a device which dispenses with it is an infringement, though it accomplishes the same purpose in perhaps an equally effective manner."

For these reasons, we hold that infringement has not been shown, and the decree of the Circuit Court is affirmed, with costs.